**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 24-6706**

───────────

BENJAMIN FORREST CARTER,

        Plaintiff - Appellant,

v.

BETH CABELL, in her individual and official capacity; KEVIN MCCOY, in his individual and official capacity; JOSHUA BRANCH, in his individual and official capacity; JOHN DOES; COMMONWEALTH OF VIRGINIA,

        Defendants - Appellees,

and

HAROLD W. CLARKE,

        Defendant.

───────────

**No. 24-6741**

───────────

BENJAMIN FORREST CARTER,

        Plaintiff - Appellant,

v.

BETH CABELL, in her individual and official capacity; KEVIN MCCOY, in his individual and official capacity; JOSHUA BRANCH, in his individual and official capacity; JOHN DOES; COMMONWEALTH OF VIRGINIA,

        Defendants - Appellees,

and

HAROLD W. CLARKE,

            Defendant.

_____

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria.  Michael Stefan Nachmanoff, District Judge.  (1:22-cv-01160-MSN-WEF)

_____

Argued:  May 7, 2026                                    Decided:  August 4, 2026

_____

Before NIEMEYER, HARRIS, and BERNER, Circuit Judges.

_____

Vacated and remanded by published opinion.  Judge Harris wrote the opinion, in which Judge Niemeyer and Judge Berner joined.

_____

**ARGUED:**  Faith Shelman, Melissa Stuckey, WAKE FOREST UNIVERSITY SCHOOL OF LAW, Winston-Salem, North Carolina, for Appellant.  Triston Chase O'Savio, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees. **ON BRIEF:**  John J. Korzen, Vivian Bolen, Student Counsel, WAKE FOREST UNIVERSITY SCHOOL OF LAW, Winston-Salem, North Carolina, for Appellant.  Jay Jones, Attorney General, Travis G. Hill, Chief Deputy Attorney General, Richard C. Vorhis, Senior Assistant Attorney General, Tillman J. Breckenridge, Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.

_____

2

PAMELA HARRIS, Circuit Judge:

Plaintiff Benjamin Carter initiated this action *pro se* while incarcerated in a Virginia state prison.  In an amended complaint, he alleged that prison officials violated his Eighth Amendment rights by subjecting him to unconstitutional conditions of confinement and violated his First Amendment rights by retaliating against him for complaining about those conditions.  The district court granted summary judgment to all the defendant officials, holding that Carter failed to exhaust administrative remedies as required by the Prison Litigation Reform Act.  As to certain defendants, the district court also ruled, in the alternative, that Carter had failed to state a cognizable claim.

We disagree with the district court.  As to exhaustion, we conclude that Carter properly exhausted his First Amendment retaliation claims because he completed the available administrative process before filing the amended complaint in which he first raised those claims in court.  Whether Carter has exhausted his Eighth Amendment claims, by contrast, turns on whether administrative remedies were truly "available" to him, *see Ross v. Blake*, 578 U.S. 632 (2016), and we remand to the district court for consideration of that question in the first instance.  Finally, we conclude that the district court erred in holding that Carter failed to state plausible Eighth Amendment and First Amendment claims against certain defendants.  Accordingly, we vacate the district court's judgment and remand for further proceedings.

3

**I.**

We begin by outlining the factual and procedural history of Carter's case, including his interactions with the Virginia Department of Corrections grievance process and the two complaints he filed in federal district court. We then summarize the district court decisions now on appeal.

**A.**

At all times relevant to this appeal, plaintiff Benjamin Carter was a prisoner in the Restrictive Housing Unit (RHU) at Sussex State Prison, a facility within the Virginia Department of Corrections (VDOC). Carter alleges that in the RHU, he was subject to conditions of confinement analogous to those we found unconstitutional in *Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019), a case concerning the conditions death row prisoners at Sussex faced between 2010 and 2015, *id.* at 353. And Carter asserts the conditions he faced were particularly harmful to him because he suffers from numerous serious mental illnesses.

Carter tried to access better conditions of confinement through the VDOC's grievance process. That process generally consists of three steps: First, an inmate must make good-faith efforts to informally resolve his issue through verbal discussion with relevant prison officials, and, if needed, an informal written complaint. Second, if informal resolution fails, the inmate must file a regular grievance. At this stage, the regular grievance is screened by an intake team, who determine whether to accept or reject the

4

grievance based on a set of filing requirements. Third, if a grievance is accepted at intake, it proceeds to a series of more formal reviews.

Carter filed numerous informal complaints and grievances about the conditions he faced in the RHU, but only three are relevant to this appeal. First, in June 2022, he submitted an informal complaint seeking reclassification into reentry programming, which would have transitioned him out of the RHU.[1] That complaint was rejected by Joshua Branch, the manager of Carter's housing unit. Branch did not provide a reason for denying the complaint, and Carter never submitted a regular grievance after Branch's rejection.

Carter's June 2022 complaint is important because, according to Carter, Branch and other Sussex officials retaliated against him for his complaint. About two weeks after rejecting the complaint, Branch allegedly told Carter: "Stop writing me up Carter, you['re] really not going to get reentry now." J.A. 113. Carter responded by again "plead[ing] to be let out of RHU," but "Branch just laughed" and said that Kevin McCoy and Beth Cabell, two wardens at Sussex, "weren't having that especially after [Carter] wrote them up about not getting reentry." *Id.*

Carter then filed two regular grievances relevant to this appeal, both in late September 2022. First, Carter submitted a grievance asserting he had been retaliated against for requesting reclassification into reentry programming and transfer out of the

---

[1] According to Carter, a VDOC policy requires reclassification of inmates who are within two years of their release date, and when he filed this informal complaint, his release date was June 2024. At oral argument, Carter's court-appointed counsel represented that although Carter has been released from Sussex State Prison, he remains incarcerated at a different facility in connection with a separate offense.

RHU. And second, Carter submitted a grievance regarding the conditions of confinement he continued to face in the RHU. Both grievances followed informal complaints Carter had submitted earlier on the same matters.

Shortly after filing these grievances – and, critically, before step two of the grievance process was completed – Carter initiated this action, *pro se*, by mailing a complaint to a federal district court in the Eastern District of Virginia. That complaint concerned only his conditions of confinement in the RHU. Carter alleged that those conditions violated the Eight Amendment and sought damages and injunctive relief under 42 U.S.C. § 1983 against Branch, McCoy, Cabell, and other unnamed Sussex officials; Harold Clarke, then the Director of the VDOC; and the Commonwealth of Virginia. The district court assessed Carter a filing fee and then conditionally granted his motion for leave to proceed *in forma pauperis*. Neither the district court nor the defendants took any other action in response to this complaint.

As noted above, when Carter filed this first complaint, his grievances were still at the second, intake stage of the grievance process. Both had been rejected at intake, and Carter's appeals of those rejections were pending. But those appeals were finalized by late October 2022, when both intake rejections were affirmed.

It was after that, in January 2023, that Carter, still proceeding *pro se*, filed the amended complaint that is now the operative complaint in this litigation. Carter reasserted his Eighth Amendment conditions of confinement claims in his amended complaint. But for the first time, he also asserted First Amendment retaliation claims against Branch,

6

McCoy, and Cabell, premised on Branch's comments to Carter following his June 2022 informal complaint. All of these claims, too, arise under 42 U.S.C. § 1983.

**B.**

In its first order, the district court reviewed Carter's amended complaint for frivolity under 28 U.S.C. § 1915A. J.A. 137. The court dismissed only one of Carter's claims: his Eighth Amendment claim against Clarke, director of the VDOC, which the court construed as premised on supervisory liability. *Id.* Carter failed to state a supervisory liability claim against Clarke, the district court reasoned, because none of his allegations allowed for an inference that Clarke "had any knowledge of [Carter's] specific conditions" of confinement. J.A. 138. The district court then denied Carter's motion for reconsideration of this ruling, applying the same reasoning: Carter's complaint, the court recognized, offered "sufficient facts to infer that Clarke had knowledge, in the abstract," of the allegedly unconstitutional conditions of confinement, but "exactly zero information to suggest that Clarke had knowledge of the fact that *plaintiff* was being held" in such conditions. J.A. 300.

With Clarke dismissed from the action, the court ordered the remaining defendants – Cabell, McCoy, Branch, and the Commonwealth of Virginia – to respond to Carter's claims. The defendants elected to concurrently file a joint answer and motion for summary judgment. The defendants argued that the exhaustion requirement in the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), foreclosed all the claims in Carter's amended complaint because Carter failed to exhaust the VDOC grievance process before filing his original complaint. And in the alternative, they asserted that Carter's allegations failed to

7

state First Amendment retaliation claims upon which relief could be granted. The defendants did not address the merits of Carter's Eighth Amendment claims.

Prior to any discovery, the district court granted summary judgment to the defendants and dismissed Carter's case. *Carter v. Cabell*, 2024 WL 1356670 (E.D. Va. Mar. 29, 2024). On exhaustion, the district court largely agreed with the defendants. Carter appeared to have exhausted his grievances before filing his *amended* complaint, the court concluded, but it was undisputed that he had not yet fully exhausted when he filed his *original* complaint. *Id.* at *5. And under our unpublished decision in *Hardin v. Hunt*, 2023 WL 3969989 (4th Cir. June 13, 2023), the court reasoned, a plaintiff cannot cure an initial failure to exhaust by completing a grievance process after commencing a lawsuit and then filing an amended complaint. *Carter*, 2024 WL 1356670, at *5. Accordingly, the court dismissed all of Carter's claims – both the Eighth Amendment claims raised in his initial complaint and the First Amendment claims raised for the first time in his amended complaint – for failure to exhaust. *Id.* at *5–6.

The district court also addressed the defendants' alternative argument that Carter's First Amendment claims should be dismissed for failure to state a claim. Now analyzing those claims under Rule 12(b)(6), *see id.* at *2, the court found that Carter's amended complaint stated a plausible First Amendment retaliation claim against Branch but failed to state such claims against McCoy and Cabell, *id.* at *6. Branch's alleged statements to Carter about Carter's June 2022 informal complaint, the district court reasoned, were sufficient to support an inference that Branch denied Carter's informal complaint, and thus kept him confined in the RHU, in retaliation for "writing [Branch] up," which constituted

8

protected First Amendment activity.  *Id.*  But in the district court's view, Branch's alleged references to McCoy and Cabell were insufficient to implicate those officials.  *Id.* at *7.[2]

Carter timely appealed, *pro se*, the district court's summary judgment decision, and we appointed counsel to represent him in the proceedings before us.[3]

## II.

On appeal, Carter challenges the district court's rulings on exhaustion under the PLRA and on the merits of his claims.  We consider each issue in turn.

## A.

We begin with whether the PLRA's exhaustion requirement forecloses Carter's claims, an issue the district court considered in a summary judgement posture.  We review the district court's grant of summary judgment de novo.  *Gowen v. Winfield*, 130 F.4th 162, 171 (4th Cir. 2025).  Summary judgment is only appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.* at 171–72.

---

[2] The district court also dismissed Carter's claims against the Commonwealth of Virginia as barred by the Eleventh Amendment and as impermissibly premised on respondeat superior liability, which is not actionable under 42 U.S.C. § 1983.  *Carter*, 2024 WL 1356670, at *7.  Carter has not appealed this holding.

[3] We appointed Professor John J. Korzen, Director of the Appellate Advocacy Clinic at Wake Forest University School of Law, as counsel for Carter.  The panel commends Professor Korzen and Wake Forest University School of Law students Vivian Bolen, Faith Shelman, and Melissa Stuckey for their written advocacy on behalf of Mr. Carter, and Ms. Shelman and Ms. Stuckey for their able oral presentations.

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Carter has two arguments for why this provision does not bar his claims. First, he asserts that he did exhaust any available administrative remedies with respect to his First Amendment claims. According to Carter, because he exhausted his grievances before filing his amended complaint, and because he asserted his First Amendment claims for the first time in that amended complaint, those claims are in compliance with § 1997e(a). Second, as to both his claims, Carter contends that any remedies he did not exhaust were not genuinely "available" to him, and that he was therefore entitled to proceed consistent with § 1997e(a). *See Ross v. Blake*, 578 U.S. 632, 642 (2016) ("Under § 1997e(a) . . . [a]n inmate . . . must exhaust available remedies, but need not exhaust unavailable ones.").

For the reasons given below, we agree with Carter on the first point and hold that the PLRA's exhaustion requirement poses no bar to his First Amendment claims. As for Carter's Eighth Amendment claims, we find it appropriate to remand to the district court to consider the availability issue in the first instance.

1.

Carter's first argument presents a simple question: Does the filing of his amended complaint control the PLRA exhaustion analysis for his First Amendment claims, or does the filing of his original complaint control that analysis? Carter does not dispute that when he filed his first complaint in this action, he had not yet exhausted his administrative remedies. But Carter did not raise any First Amendment claims in that complaint. And

10

the parties agree that by the time Carter filed the amended complaint that raised his First Amendment claims for the first time, he had exhausted the available administrative remedies.[4]  So, if the timing of the original complaint controls the analysis, Carter's First Amendment claims are barred by the PLRA, but if the amended complaint controls, they may proceed.

The federal courts of appeals that have considered this question have adopted a spectrum of approaches.  Under the broadest approach, adopted by the Third and Ninth Circuits, the timing of the amended complaint controls the PLRA exhaustion analysis for *all* claims pleaded in that complaint – including claims (like Carter's Eighth Amendment claims) that also appear in the original complaint and that were not exhausted when the original complaint was filed.  *See Saddozai v. Davis*, 35 F.4th 705, 708–09 (9th Cir. 2022); *Garrett v. Wexford Health*, 938 F.3d 69, 84, 87–88 (3d Cir. 2019).  Other circuits take a more middle-ground position, holding that an amended complaint controls the analysis for claims raised for the first time in the amended complaint (like Carter's First Amendment

---

[4] The district court assumed that Carter properly exhausted the VDOC grievance process by the time he filed his amended complaint without conclusively deciding that question. *See Carter*, 2024 WL 1356670, at *5 (finding that Carter "arguably exhausted" his claims).  But in their brief on appeal and at oral argument, the defendants have expressly conceded that Carter did in fact exhaust his remedies in October 2022, well before filing his amended complaint.  The PLRA's exhaustion requirement is not jurisdictional, but instead is an affirmative defense that must be pleaded and proved by the defendants. *Jones v. Bock*, 549 U.S. 199, 211–12 (2007).  We thus take the defendants at their word that Carter exhausted the VDOC grievance process before filing his amended complaint. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (under "the principle of party presentation . . . we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present" (internal quotation marks omitted)).

claims) but not for claims pleaded in the original complaint. *Barnes v. Briley*, 420 F.3d 673, 678 (7th Cir. 2005); *Chambers v. Sood*, 956 F.3d 979, 984–85 (7th Cir. 2020); *see also Mattox v. Edelman*, 851 F.3d 583, 595 (6th Cir. 2017) (adopting similar analysis). And the Tenth Circuit appears to have adopted a still-narrower rule that for purposes of the PLRA's exhaustion requirement, an amended complaint may "supersed[e] the original complaint's allegations but not its timing." *May v. Segovia*, 929 F.3d 1223, 1229 (10th Cir. 2019) (emphasis omitted). That case, however, did not involve claims asserted for the first time in an amended complaint, so it remains unclear how the Tenth Circuit would decide the specific issue we confront.

Here, Carter does not ask us to embrace the approach of the Third and Ninth Circuits, under which both his Eighth Amendment and his First Amendment claims could proceed because both were exhausted before the filing of his amended complaint. Instead, he asks us to consider the impact of his amended complaint on his First Amendment claims only – claims that were raised for the first time in his amended complaint, after they were exhausted administratively. Accordingly, we leave for another day the merits of the broader rule adopted by the Third and Ninth Circuits. We focus our attention where Carter focuses it – exclusively on his First Amendment claim – and turn to the relatively narrow question his argument poses: Is the PLRA exhaustion analysis for Carter's First Amendment claims controlled by the filing date of his original complaint or by the filing date of his amended complaint?

We agree with Carter that the filing date of the amended complaint controls. If a prisoner like Carter files a complaint in federal court before exhausting his administrative

12

remedies, but subsequently files an amended complaint raising a new claim as to which exhaustion has been completed, the PLRA's exhaustion requirement does not bar the newly asserted, exhausted claims from proceeding.

We start from a proposition set out by the Supreme Court in *Jones v. Bock*, 549 U.S. 199 (2007): As a general rule, courts should follow their usual practice under the Federal Rules of Civil Procedure in interpreting the PLRA. *See id.* at 212 (instructing that courts applying the PLRA "should generally not depart from the usual practice under the Federal Rules on the basis of perceived policy concerns"); *Garrett*, 938 F.3d at 87 (describing *Jones*'s teaching that "the usual procedural rules apply to PLRA cases unless the PLRA specifies otherwise"). In *Jones*, the Supreme Court applied that baseline understanding to reject two specialized rules lower courts had applied in the PLRA context. One construed PLRA exhaustion as "a pleading requirement the prisoner must satisfy in his complaint." 549 U.S. at 204. But that was contrary, the Supreme Court held, to the "usual practice under the Federal Rules," which regarded "exhaustion as an affirmative defense" the defendant must plead and prove. *Id.* at 212. The Court likewise rejected a "total exhaustion rule" that would require dismissal of a prisoner's entire complaint if some but not all claims were unexhausted. *See id.* at 221–22. Again, the Court found no indication that Congress, through the PLRA's exhaustion provision, elected to depart from the general rule that "if a complaint contains both good and bad claims, the court proceeds with the good and leaves the bad." *Id.* at 221.

In short, we are instructed to apply our usual procedural rules to the PLRA question before us. And that is enough to decide this portion of Carter's case, because in our circuit,

13

"the usual practice" under Rule 15 is to use the date of an *amended* complaint to conduct a statutory exhaustion analysis with respect to claims raised for the first time in that amended complaint. We held as much in *Feldman v. Law Enforcement Associates Corp.*, 752 F.3d 339 (4th Cir. 2014), which dealt with the exhaustion requirement of the Sarbanes-Oxley Act (SOX). *Id.* at 345 (first citing 18 U.S.C. § 1514A(b)(1)(A), and then citing 29 C.F.R. § 1980.103). There, the plaintiff first filed a complaint raising a claim under the Americans with Disabilities Act, then exhausted a SOX claim, and then filed an amended complaint asserting that SOX claim for the first time. *Id.* at 343, 347. Applying Rule 15 of the Federal Rules of Civil Procedure, we held that the SOX claim could go forward: Though unexhausted when the plaintiff filed his original complaint, it had been exhausted before the filing of the amended complaint – and it was that complaint, not the original, that controlled the exhaustion inquiry as to claims raised for the first time in the amended complaint. *Id.* at 347–48; *see* Fed. R. Civ. P. 15 (governing amended and supplemental pleadings). In that sense, the plaintiff's amended complaint operated to "cur[e]" the exhaustion defect that otherwise would have prevented his SOX claim from proceeding. *Id.* at 347.[5]

---

[5] In *Feldman*, the plaintiff's SOX claim, though asserted for the first time in his amended complaint, arose out of the same conduct and occurrences alleged in the original complaint. 752 F.3d at 347. That circumstance posed an additional complexity: Ordinarily, the plaintiff's amended complaint would have "related back" to the date of the original pleading under Rule 15(c). *See id.* at 346; Fed. R. Civ. P. 15(c). But on that date, as noted above, the plaintiff's SOX claim had yet to be exhausted, so relation back would have meant the SOX claim could not proceed. *Id.* We explained that we were "not required to apply the doctrine of relation back so literally as to carry [the SOX claim] to a time" when it was unexhausted. *Id.* at 347. Instead, we construed the amended complaint as a
(Continued)

Following *Jones*, we apply the same understanding of Rule 15 and the operation of amended complaints to the PLRA and Carter's First Amendment claims. Carter, like the plaintiff in *Feldman*, exhausted his First Amendment claims before first introducing them into this litigation through his amended complaint. And as in *Feldman*, it is the date of Carter's amended complaint, not the date of his original complaint, that controls the exhaustion analysis. Accordingly, § 1997e(a) of the PLRA does not bar those First Amendment claims from proceeding.

Our unpublished decision in *Hardin v. Hunt*, upon which the district court relied, is not inconsistent with this result. *Hardin* did observe, as the district court noted, that a prisoner's "noncompliance with the PLRA's exhaustion requirement cannot be 'cured' by amendment under Rule 15." 2023 WL 3969989, at *3. But that is a reference to a procedural circumstance not presently before us. In *Hardin*, the plaintiff raised his claims in an original complaint, then exhausted, and then filed an amended complaint raising the *same* claims.[6] *Hardin* held a prisoner could not do that. But it did not address the effect of an amended complaint that raises *new* claims, introduced into the litigation for the first

---

supplemental pleading under Rule 15(d), and because supplemental pleadings under Rule 15(d) do not relate back to the date of the original complaint, the later date controlled, and the plaintiff's SOX claim was properly exhausted. *Id.* at 347–48.

[6] The plaintiff in *Hardin* did name new defendants in his amended complaint. 2023 WL 3969989, at *1. But we concluded there that the "mere act" of naming new defendants did not "create 'new' claims for purposes of PLRA exhaustion." *Id.* at *3. So, we had no occasion to consider a situation – like the one before us today – in which new claims are raised for the first time in an amended complaint after they have been exhausted.

time only after they have been exhausted. That is the issue addressed in *Feldman*, a published decision that pre-dates *Hardin*, and the issue we resolve today.

The defendants resist this outcome and the application of *Feldman*, arguing that the text of the PLRA's exhaustion requirement is to the contrary. Under the PLRA, they explain, a prisoner must exhaust administrative remedies before he brings an "action." *See* 42 U.S.C. § 1997e(a) ("No action shall be brought . . . until such administrative remedies as are available are exhausted."). And Carter, they contend, brought his "action" when he filed his original complaint, so it is the filing of that complaint, and not the amended complaint, that must control the exhaustion analysis.

The Supreme Court rejected a very similar argument in *Jones*. In that case, as noted above, the Court considered a PLRA-specific "total exhaustion" rule adopted by some courts, under which a prisoner's complaint would be dismissed in its entirety if it included both unexhausted and exhausted claims. 549 U.S. at 220–21. Defenders of that rule, like the defendants here, zeroed in on the PLRA's use of the word "action." *See id.* An "action," they contended, is not the same as a "claim," and if Congress "intended courts to dismiss only unexhausted claims while retaining the balance of the lawsuit, the word 'claim' rather than 'action' would have been used in this provision." *Id.* at 220. The Court disagreed, dismissing the statutory phrase "no action shall be brought" as "boilerplate language" insufficient to override standard procedural practice. *Id.* The same reasoning applies here: Carter raised his First Amendment *claim* for the first time in his amended complaint, and the PLRA's boilerplate reference to "*action*" does not require that we use his original complaint as the baseline for measuring exhaustion of that claim. *See Mattox*,

16

851 F.3d at 595 (adopting same approach and explaining that "the Supreme Court [in *Jones*] has already rejected the argument that the word 'action' in § 1997e(a) means something different than 'claim'"); *Jackson v. Fong*, 870 F.3d 928, 934 (9th Cir. 2017) (adopting same reasoning because "the Supreme Court squarely rejected relying on the distinction between 'action' and 'claim' in the PLRA" in *Jones*).

We emphasize that the rule we adopt today is fully consistent with the aims of the PLRA's exhaustion requirement. As the Supreme Court has explained, a key benefit of PLRA exhaustion is that it allows a prison to address complaints internally before it is subjected to the time and expense of litigation. *Jones*, 549 U.S. at 219; *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Allowing a prisoner like Carter to proceed on a claim that is exhausted before it is first introduced in litigation is in keeping with that goal. Here, prison officials had a "fair opportunity" to address Carter's First Amendment claims administratively before they were required to defend against them in court, just as the PLRA contemplates. *See Mattox*, 851 F.3d at 592–93. Indeed, the defendants were not served with Carter's original complaint or required to take any action in court until after Carter had exhausted both his claims and filed his amended complaint. Nothing about this scenario undermines the defendants' ability to take corrective action on Carter's First Amendment claims before "incurring the hassle and expense of litigation." *Id.* at 592.

The PLRA is also intended to promote economy and efficiency for both prison defendants and the courts, "reduc[ing] the quantity and improv[ing] the quality of prisoner suits." *Woodford*, 548 U.S. at 94. Here, it is the defendants' position that would undermine that goal by resulting in more litigation, not less. Under the approach advocated by the

17

defendants and adopted by the district court, Carter can go forward with his exhausted First Amendment claims – but he must do so by filing a separate action rather than by amending his original complaint to raise new claims that have been exhausted. *See Carter*, 2024 WL 1356670, at *5–6. "Such a requirement would promote the precise inefficiency the PLRA was designed to avoid – requiring courts to docket, assign and process two cases where one would do." *Saddozai*, 35 F.4th at 710. In *Jones*, the Supreme Court rejected a "total exhaustion" rule for just this reason, explaining that it would require district courts to "begin [the complaint review] process all over again" when a prisoner refiled a complaint that included only his exhausted claims. 549 U.S. at 223. Again following *Jones*'s guidance, we decline to adopt a rule that would unnecessarily increase the number of prisoner lawsuits that prisons and federal courts must handle.

For all these reasons, we agree with Carter that his First Amendment claim, pleaded for the first time in his amended complaint after all available administrative remedies were exhausted, satisfies the PLRA's exhaustion requirement. We emphasize again the narrow nature of this holding. Carter has not asked us to embrace the broader rule adopted by the Third and Ninth Circuits – under which the PLRA exhaustion requirement is controlled by an amended complaint as to *all* claims pleaded in the amended complaint – and we do not address the merits of such an approach. We hold only that Carter's First Amendment claim, because it was not raised in court until after it was exhausted, may proceed consistent with § 1997e(a) of the PLRA.

18

2.

We turn next, and more briefly, to Carter's argument respecting exhaustion of his Eighth Amendment claims. Carter acknowledges that he did not exhaust those claims before raising them in his original complaint. And as noted above, he does not argue that this problem can be resolved by virtue of his amended complaint. Instead, he argues on appeal, as before the district court, that he was not required to exhaust his Eighth Amendment claims because the VDOC's grievance process was not genuinely "available" to him within the meaning of the PLRA.

Under § 1997e(a), a prisoner must exhaust "such administrative remedies as are available." That mandate, as the Supreme Court held in *Ross*, incorporates one "baked in[]" limit: An inmate need exhaust only those remedies actually available to him. 578 U.S. at 648; *Gowen*, 130 F.4th at 176; *Griffin v. Bryant*, 56 F.4th 328, 335 (4th Cir. 2022). If a prison grievance process is not "meaningfully capable of use to obtain some relief," *Griffin*, 130 F.4th at 335 (internal quotation marks omitted), then an inmate "is considered to have satisfied the exhaustion requirement" without more, *Gowen*, 130 F.4th at 176. This includes cases in which "1) the administrative procedure is 'a simple dead end' – in other words, the prison officials are 'unable or consistently unwilling to provide any relief'; 2) the process is 'so opaque' that it becomes practically 'incapable of use' such that 'no ordinary prisoner can discern or navigate it'; or 3) the prison 'thwart[s] inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" *Id.* (alteration in original) (quoting *Ross*, 578 U.S. at 643–44).

19

Although Carter presented the question to the district court, the district court did not address whether the VDOC grievance process was available to Carter within the meaning of *Ross*. *See generally Carter*, 2024 WL 1356670.[7]  We follow our usual practice and remand to the district court to consider this question in the first instance. *See Doe v. N.C. State Univ.*, 125 F.4th 498, 507 (4th Cir. 2025) (emphasizing that we are "a court of review, not of first view").  That course is especially appropriate here.  Whether administrative remedies are meaningfully available under *Ross* is a fact-intensive inquiry that may turn on the details of "how [a] grievance procedure actually operates and is carried out by [] prison officials," or other specific circumstances.  *Griffin*, 56 F.4th at 336; *see also id.* at 338–39 (remanding for further factual development necessary to resolve the "availability" question).  Here, there has been no factual development at all as to how the VDOC grievance procedures actually operate, or as to Carter's contention that he was "thwarted" from completing the administrative process on his Eighth Amendment claim when his June 2022 informal complaint was met with retaliatory threats from the defendants.  Accordingly, we remand Carter's Eighth Amendment claims to the district court to consider in the first instance the availability of administrative remedies under *Ross*, and for any "appropriate discovery and development of the record" in aid of that inquiry.  *Griffin*, 56 F.4th at 338–39.

---

[7] Our point is not to fault the district court for this oversight.  The papers submitted in the district court by Carter, then proceeding *pro se*, were voluminous, mostly handwritten, and sometimes hard to parse.

* * * *

For the reasons given above, we vacate the district court's award of summary judgment to the defendants on exhaustion grounds. As to Carter's First Amendment claims, we hold that Carter properly exhausted any available administrative remedies. As to Carter's Eighth Amendment claims, we remand for consideration, in the first instance, of whether the VDOC grievance process was "available" to Carter within the meaning of *Ross*.

**B.**

Our vacatur of the district court's grant of summary judgment on exhaustion grounds does not fully resolve this appeal. That is because, as outlined above, the district court also held that Carter failed to state a plausible Eighth Amendment claim against Clarke and failed to state plausible First Amendment retaliation claims against McCoy and Cabell. *See* J.A. 137–38 (Eighth Amendment claim against Clarke); *Carter*, 2024 WL 1356670, at *6 (First Amendment claims against McCoy and Cabell). If that were correct, we could affirm the dismissal of those claims, at least, on this alternative ground. But Carter maintains that both of these decisions were incorrect, so we address them now.

We review de novo the district court's dismissal for failure to state a claim, which proceeded under a 42 U.S.C. § 1915A screen as to the Eighth Amendment claim, J.A. 137, and under a Rule 12(b)(6) analysis as to the First Amendment claims, *Carter*, 2024 WL 1356670, at *2. *See Jehovah v. Clarke*, 798 F.3d 169, 176 (4th Cir. 2015); *Gowen*, 130 F.4th at 171. Dismissal in these circumstances is only proper if, after accepting all the allegations in the complaint as true and drawing all reasonable inferences in favor of the

21

plaintiff, the complaint fails to state a plausible claim for relief. *Gowen*, 130 F.4th at 171. Moreover, where, as here, a complaint "implicates a civil rights interest, we must not dismiss [it] unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." *Id.* (internal quotation marks omitted). And, because Carter filed his amended complaint *pro se*, we must liberally construe his allegations. *Id.*

We first address Carter's Eighth Amendment claim against Clarke, the director of the VDOC while Carter was confined in Sussex State Prison's Restrictive Housing Unit in 2022. As the district court explained, Carter seeks to hold Clarke liable for the allegedly unconstitutional conditions of confinement he experienced in the RHU under a theory of supervisory liability. But the district court believed Carter had failed to state a claim for such liability, because he did not allege that "Clarke had any knowledge of [Carter's] specific conditions." J.A. 138. It was not enough, the court reasoned, that Carter's complaint alleged facts from which it could be inferred that Clarke "had knowledge, in the abstract," of the conditions of which Clarke complained. Carter could go forward only if he also alleged that Clarke "had knowledge of the fact that *plaintiff*," specifically, faced unconstitutional conditions of confinement. J.A. 300.

We agree with Carter that the district court erred in this regard. To establish supervisory liability under 42 U.S.C. § 1983, a plaintiff must satisfy three elements. The first – the one on which the district court relied – requires a plaintiff to allege "that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens

22

*like the plaintiff.*" *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (emphasis added; internal quotation marks omitted).[8]  Carter was not required to show that Clarke was monitoring *his* incarceration, in particular, and was aware that *he*, specifically, was subject to unconstitutional conditions.  If Clarke knew that his subordinates had created widespread unconstitutional conditions of confinement, posing an "unreasonable risk" to prisoners *like* Carter, that would be sufficient to satisfy this element.  *Id.*  And the district court itself seems to have believed that Carter's complaint did make this showing, sufficiently alleging that Clarke was aware "in the abstract" of the allegedly unconstitutional conditions.  J.A. 300.

Because the district court failed to consider Carter's supervisory liability claim against Clarke under the correct legal standard, we vacate its dismissal of that claim and remand for reconsideration.  If the district court finds that Carter may be deemed to have exhausted his Eighth Amendment claims because administrative remedies were not available to him under *Ross*, then it should reconsider whether Carter has properly alleged a supervisory-liability claim against Clarke.[9]

---

[8] Carter also must sufficiently allege that Clarke's response to this knowledge was "so inadequate as to show deliberate indifference to or tacit authorization" of the alleged unconstitutional conditions, and that there was "an affirmative causal link" between Clarke's inaction and an injury suffered by Carter. *Shaw*, 13 F.3d at 799 (internal quotation marks omitted).  The district court did not consider whether Carter adequately alleged these elements but may do so on remand as necessary.

[9] On appeal, the defendants also argue that Carter's amended complaint failed to plausibly state an Eighth Amendment conditions of confinement claim at all, against any of the defendants.  Neither Carter nor the defendants briefed this argument below, so the district court never had a chance to address it.  Following our usual practice, we decline to (Continued)

Next are Carter's First Amendment retaliation claims against McCoy and Cabell. Those claims, recall, are premised on comments Branch allegedly made to Carter following Carter's informal complaint requesting transfer out of the RHU and into reentry programming. According to Carter, Branch approached him two weeks after denying his informal complaint and said: "Stop writing me up Carter, you['re] really not going to get reentry now." J.A. 113. Carter again asked for a transfer, and Branch replied that "McCoy and Cabell weren't having that especially after [Carter] wrote them up about not getting reentry." *Id.*

To state a plausible First Amendment retaliation claim, Carter's allegations must show that (1) "he engaged in protected First Amendment activity," (2) "the defendant[s] took some action that adversely affected his First Amendment rights," and (3) there was a "causal relationship between his protected activity and the defendant[s'] conduct." *Gowen*, 130 F.4th at 173. The district court held that Carter did state a plausible First Amendment claim against Branch: Carter's submission of the informal complaint constituted protected First Amendment activity; Branch's denial of Carter's grievance – effectively a denial of a transfer – "could well constitute an adverse action"; and from Branch's alleged statements to Carter, a causal nexus could be inferred. *Carter*, 2024 WL 1356670, at *6. But the district court dismissed Carter's retaliation claims against McCoy and Cabell. In its view, Branch's alleged statements did "not implicate [] McCoy or Cabell": They did not

---

undertake this inquiry in the first instance. The district court may address this argument on remand as it sees fit. *See Doe*, 125 F.4th at 507.

24

establish that those defendants knew of Carter's informal complaint or "did more than interact with [Carter] in passing." *Id.* at *7.

We disagree with district court's assessment as to McCoy and Cabell. As the district court itself recounted, Carter's complaint alleges that he regularly complained to McCoy and Cabell, as well as to Branch, about his need for his reclassification and transfer out of the RHU, suggesting more than "passing" interactions. *Id.* at *6–7. And critically, according to Carter, Branch told him that "McCoy and Cabell weren't having that" – Carter's reclassification and transfer – "especially after I [Carter] wrote them up about not getting reentry." J.A. 113. That is of course just an allegation; maybe Branch said no such thing. Or maybe Branch is an unreliable narrator, and McCoy and Cabell said no such thing. But for now, we take these allegations as truthful and draw all inferences in favor of Carter. *Gowen*, 130 F.4th at 171. And from these allegations, it reasonably can be inferred that McCoy and Cabell, like Branch, played a role in denying Carter a transfer because Carter "wrote them up," J.A. 113, a form of protected activity. For the reasons given by the district court with respect to Branch, those inferences are enough, at this early stage of the litigation, to satisfy the elements of Carter's First Amendment claim. *See Carter*, 2024 WL 1356670, at *6.

We emphasize that we take no position on the veracity of these allegations or the ultimate merits of Carter's First Amendment claims. But particularly in light of the liberal construction we must give Carter's amended complaint, which was filed *pro se*, those allegations are sufficient to withstand a motion to dismiss under Rule 12(b)(6).

25

## III.

For the foregoing reasons, we vacate the district court's grant of summary judgment to the defendants on exhaustion grounds. We likewise vacate the district court's alternative dismissals of the Eighth Amendment supervisory liability claim against defendant Clarke and the First Amendment retaliation claims against defendants McCoy and Cabell. We remand to the district court for further proceedings consistent with this opinion.

*VACATED AND REMANDED*